Approved: _____
JONATHAN COHEN/ANDREW BEATY
Assistant United States Attorneys

Before:   THE HONORABLE GABRIEL W. GORENSTEIN
          United States Magistrate Judge
          Southern District of New York

**DOC #_____**

- - - - - - - - - - - - - - - - - - x
                                     :
UNITED STATES OF AMERICA             :    SEALED COMPLAINT
                                     :
        -v.-                         :    Violations of
                                     :    18 U.S.C. §§ 2, 1343, 1956
                                     :    26 U.S.C. § 7201
                                     :
ROCKWELL GAJWANI,                    :
  a/k/a "Rockie Gajwani,"            :    **16 MAG**
                                     :
        Defendant.                   :    COUNTY OF OFFENSE:
                                     :    NEW YORK
- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        ROBERT CLARK, being duly sworn, deposes and says that he
is an Inspector with the United States Postal Inspection Service,
and charges as follows:

COUNT ONE
(Wire Fraud)

        1.   From at least in or about February 2012, through in
or about March 2013, in the Southern District of New York and
elsewhere, ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant,
willfully and knowingly, having devised and intending to devise a
scheme and artifice to defraud, and for obtaining money and property
by means of false and fraudulent pretenses, representations, and
promises, did transmit and cause to be transmitted by means of wire
communications in interstate and foreign commerce, writings, signs,
signals, pictures, and sounds for the purpose of executing such
scheme and artifice, to wit, GAJWANI engaged in a scheme to defraud
the company that employed him (the "Manhattan Real Estate Company"),

1

and sent electronic transfers of money and electronic communications in interstate commerce to further that scheme.

(Title 18, United States Code, Section 1343.)

## COUNT TWO
(Money Laundering)

2.     From in or about May 9, 2012, through in or about May 23, 2012, in the Southern District of New York and elsewhere, ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, did conduct and attempt to conduct such a financial transaction, to wit, arranging payments by check from another individual to GAJWANI, which in fact involved the proceeds of specified unlawful activity, to wit, the wire fraud scheme alleged in Count One, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of these proceeds of specified unlawful activity.

(Title 18, United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) and 2.)

## COUNT THREE
(Tax Evasion)

3.     From on or about January 1, 2011, through on or about July 9, 2015, in the Southern District of New York and elsewhere, ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant, willfully and knowingly did attempt to evade and defeat a substantial part of the income tax due and owing by GAJWANI to the United States of America for calendar year 2011, by various means, including, among others, (a) filing, on or about April 17, 2012, an application for an extension of time to file a U.S. Individual Income Tax Return, Form 1040 ("Form 1040") for calendar year 2011 but failing to file a Form 1040 for calendar year 2011 or to make any federal tax payments for calendar year 2011 by the dates on which such tax return and payment were due; and (b) filing on or about July 9, 2015, a  Form 1040 for calendar year 2011 that falsely underreported income by more than $480,000.

(Title 26, United States Code, Section 7201.)

2

COUNT FOUR
(Tax Evasion)

4.     From on or about January 1, 2012, through on or about
July 9, 2015, in the Southern District of New York and elsewhere,
ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant, willfully
and knowingly did attempt to evade and defeat a substantial part of
the income tax due and owing by GAJWANI to the United States of America
for calendar year 2012 by various means, including, among others,
(a) filing, on or about April 17, 2013, an application for an
extension of time to file a Form 1040 for calendar year 2012 but
failing to file a Form 1040 for calendar year 2012 or to make any
federal tax payments for calendar year 2012 by the dates on which
such tax return and payment were due; (b) causing, in or about
February 2012, the records of the amounts of his compensation kept
on file in the payroll system maintained by the Manhattan Real Estate
Company to be fraudulently altered and reduced by more than $600,000
a year; (c) causing payments that GAJWANI received from the Manhattan
Real Estate Company, either directly or through another employee of
the Manhattan Real Estate Company, to be mischaracterized as company
expenses; and (d) filing on or about July 9, 2015, a Form 1040 for
calendar year 2012 that that falsely claimed over $260,000 in
improper deductions.

(Title 26, United States Code, Section 7201.)

COUNT FIVE
(Tax Evasion)

5.     From in or about February 2012, through on or about
July 9, 2015, in the Southern District of New York and elsewhere,
ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant, willfully
and knowingly did attempt to evade and defeat a substantial part of
the income tax due and owing by GAJWANI to the United States of America
for calendar year 2013 by various means, including, among others,
(a) filing, on or about April 17, 2014, an application for an
extension of time to file a Form 1040 for calendar year 2013 but
failing to file a Form 1040 for calendar year 2013 or to make any
federal tax payments for calendar year 2013 by the dates on which
such tax return and payment were due; (b) causing, in or about
February 2012, the records of amounts of his compensation kept on
file in the payroll system maintained by the Manhattan Real Estate
Company to be fraudulently altered and reduced by more than $600,000
a year; (c) causing payments that GAJWANI received from the Manhattan
Real Estate Company to be mischaracterized as company expenses; and

3

(d) filing on or about July 9, 2015, a Form 1040 for calendar year 2013 that falsely underreported his income by more than $270,000.

(Title 26, United States Code, Section 7201.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

6.      Since approximately May 2012, I have been an Inspector with the United States Postal Inspection Service ("USPIS").   I am presently assigned to the New York Field Office of the USPIS, which is located in Manhattan.   I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals.   This affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals.   Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.   Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## THE WIRE FRAUD AND MONEY LAUNDERING

### *The Manhattan Real Estate Company*

7.      Based on my review of email, documents and information provided by a real estate private equity investment manager based in Illinois ("Company-1"), I have learned, in part, the following:

a. ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant, worked as a paid consultant for Company-1 starting in or around January 2009.

b. On or about September 28, 2011, GAJWANI submitted a business plan to Company-1 proposing that Company-1 create and fund a new company that would make real estate investments in Manhattan (the "Manhattan Real Estate Company," as referenced above and below).

4

c. On or about October 14, 2011, Company-1 entered an employment agreement with GAJWANI (the "Employment Agreement") in connection with the creation and management of the Manhattan Real Estate Company.

d. Under the Employment Agreement, Company-1 agreed to pay GAJWANI $700,000 in current income (the "Agreed Salary"), and to provide GAJWANI with a target amount of short term incentive compensation of $250,000 (the "STIC"). The Employment Agreement stated that the Agreed Salary and STIC "shall be prorated for the initial partial year which is deemed to be September 1 – December 31." The Employment Agreement provided for additional payments to GAJWANI in the form of a school allowance, an apartment allowance, an apartment broker fee, a consulting agreement fee related to services provided in September and October of 2011, and a payment related to civil judgments and mortgage obligations (collectively, excluding Agreed Salary and STIC, the "Other Compensation"). The Employment Agreement provided that the payment related to civil judgments and mortgage obligations (the "Credit Matter Payment") would be $125,385 and would be deducted from future short-term incentive compensation amounts.

e. GAJWANI was the Chief Executive Officer and President of the Manhattan Real Estate Company, which was based in Manhattan, from in or about October 2011 through in or about March 2013.

f. In or about late October 2011, the Manhattan Real Estate Company hired a Chief Operating Officer ("Employee-1").

g. In or about November 2011, GAJWANI hired another employee for the Manhattan Real Estate Company ("CW-1") as the third employee of the company, after GAJWANI and Employee-1.[1]

### GAJWANI Reduces His Salary
### In Payroll Software In February 2012

8.    I have interviewed another employee of the Manhattan Real Estate Company ("Employee-2"). Based on speaking with

---

[1] CW-1 pled guilty to a federal felony in May 2016, pursuant to a cooperation agreement with the Government. CW-1 is cooperating with the Government in the hope of receiving leniency at sentencing. The information that CW-1 has provided to the Government has been corroborated by documents and other information obtained in the course of the Government's investigation.

5

Employee-2, reviewing certain email correspondence, and reviewing records and information provided by Company-1 and the Manhattan Real Estate Company, I have learned, in part, the following:

a. In or about February 2012, Employee-2 was hired by the Manhattan Real Estate Company to be an executive assistant.

b. After being hired, Employee-2 reported directly to ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant.

c. One of Employee-2's duties was to input employee payroll figures into the payroll software platform that the Manhattan Real Estate Company used to manage payroll (the "Payroll Software").

d. At the time that Employee-2 began working with the Payroll Software at the Manhattan Real Estate Company, GAJWANI's biweekly salary was listed as $26,923.07.  $26,923.07 on a biweekly basis is equivalent to $699,999.82 on an annualized basis, which is approximately equal to the Agreed Salary, $700,000.

e. In or about February 2012, GAJWANI first asked Employee-2 to reduce GAJWANI's salary to zero in the Payroll Software, which Employee-2 did not do.  Soon thereafter, GAJWANI asked Employee-2 to reduce his salary to $2,000 biweekly and did not provide an explanation to Employee-2 for this request.  On February 17, 2012, Employee-2 complied with this request and emailed an employee at the company in charge of managing the Payroll Software, with instructions to change GAJWANI's income to $2,000 biweekly.

f. The Manhattan Real Estate Company used information stored in the Payroll Software to prepare tax forms reflecting employee compensation that were sent to the Internal Revenue Service (the "IRS") on an annual basis.

9.    Based upon my training, experience and involvement in this investigation, I believe that ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant, caused his salary to be drastically underreported in the Payroll Software system, among other possible reasons, to cause inaccurate income figures to be sent to the IRS and/or to reduce the amount of tax withholding taken from his paychecks.

10.    Based on my review of email, documents and information provided by Company-1 and the Manhattan Real Estate Company, I have learned, in part, the following:

6

a. On or about April 5, 2012, Company-1 and ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant, agreed to Managing Board Resolution Number 013 ("Resolution 013") of the Manhattan Real Estate Company, which, among other things, fixed the amount of Short Term Investment Compensation of GAJWANI at $104,166 for the partial year deemed to be September 1, 2011 to December 31, 2011.  By an email message sent on April 5, 2012, GAJWANI expressly agreed to adopt Resolution 013, which also provided that this $104,166 be applied towards the Credit Matter Payment, which was a payment of $125,385 that GAJWANI received in November 2011, pursuant to the terms of his Employment Agreement.

*The July 2012 Landlord Letter*

11.    Based on my review of email correspondence and my conversations with an employee of Company-1 ("Employee-3"), I have learned, in part, the following:

i.    Employee-3 was a managing partner at Company-1 during the times relevant to this Complaint.

ii.    On July 10, 2012, ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant, sent an email to Employee-3 (the "July 10, 2012 Email"), stating in part, "[W]ould you be able to write the below on your letter head?  Will be a big help as we are close on an apartment . . . landlord requested this as I had sent them the letter from last summer and they wanted an updated version?"

iii.    In the July 10, 2012 Email, GAJWANI included the proposed text he was requesting for a letter from Employee-3, which states that "Rockie Gajwani is the President & Chief Executive Officer of [the Manhattan Real Estate Company] . . . Mr. Gajwani's annual compensation is $925,000."

iv.    An employee at Company-1 reviewed this letter and replaced $925,000 with the correct amount, $950,000.

v.    The correct amount as of July 2012 was $950,000 because GAJWANI's salary had been set at $700,000 in the Employment Agreement and the Short Term Incentive Compensation target was $250,000 for 2012.

vi.    Based on GAJWANI's request, on July 10, 2012, Employee-3 issued a letter from Company-1 stating, among other

7

things, "Total annual compensation for Rockie Gajwani is $950,000
(current income of $700,000 and a targeted short term incentive
compensation of $250,000)."

### Analysis Of Amounts GAJWANI Took From The Manhattan Real Estate Company

12.   Based on my conversations with CW-1 and other
witnesses, as well as my review of bank records, email messages, and
records of Company-1 and the Manhattan Real Estate Company, including
the Compensation Agreement and other materials, I have learned, in
part, the following:

a. When ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the
defendant, was with CW-1, GAJWANI would stop by a branch of the bank
at which the Manhattan Real Estate Company had a bank account
("Bank-1") and would have money wired from the Manhattan Real Estate
Company's bank account to GAJWANI's personal account.  GAJWANI often
dealt with one banker in particular at a Bank-1 branch in Manhattan
("Banker-1") and would initiate wire transfers by speaking to
Banker-1 on the phone and thereafter go to the Manhattan bank branch
to sign for the wire.

b. GAJWANI possessed a checkbook for a bank account of the
Manhattan Real Estate Company held at Bank-1 (the "Bank Account")
and wrote numerous checks to himself, starting in late 2011.  Over
the course of his employment, GAJWANI wrote himself over $940,000
in checks from the Bank Account.  Of these checks, approximately
$124,000 in checks included a memo line that denoted "[e]xpenses."

c. In addition to writing checks to himself, GAJWANI also took
money by wiring money from the Bank Account to his personal bank
account.  Over the course of his employment, GAJWANI wired over
$1,700,000 to his personal bank account from the Bank Account.

d. GAJWANI made wire transfers from the Bank Account to his
personal bank account by calling a Manhattan branch of Bank-1, by
visiting a Manhattan branch of Bank-1, and by emailing
representatives of Bank-1.

e. On or about March 18, 2012, at 7:13 p.m., GAJWANI sent an
email to Banker-1 that stated, in part, "Can you please wire $9,000
from my personal account to my personal [second bank ("Bank-2")]
account-" and provided GAJWANI's personal account numbers.  GAJWANI
then forwarded this same email to another banker at Bank-1

("Banker-2"), stating, in part, "Can you please help with the below?" Banker-2 sent GAJWANI an email on March 19, 2012, at 12:39 p.m. stating, in part, "Rockie – Your personal account is currently overdrawn due to debits that have come out from American Express. There are insufficient funds to initiate the wire you requested." GAJWANI sent an email response to Banker-2 stating, "Ok Please transfer 32,600 from [the Manhattan Real Estate Company bank account] to personal ASAP And please do the [Bank-2] wire as soon as possible[.]"  At the time he sent this email to Banker-2, who was located in New York, GAJWANI was in Florida.

    f. By no later than February 2012, GAJWANI had begun taking more money from the Manhattan Real Estate Company's bank account than he was entitled to under the Employment Agreement.

    g. By May 2012, GAJWANI had taken over $200,000 more from the Manhattan Real Estate Company's bank account than he was entitled to under the Employment Agreement.

    h. By September 2012, GAJWANI had taken over $700,000 more from the Manhattan Real Estate Company's bank account than he was entitled to under the Employment Agreement.

    i. By March 2013, GAJWANI had taken over $1,300,000 more from the Manhattan Real Estate Company's bank account than he was entitled to under the Employment Agreement.  In total, by March 2013, GAJWANI had taken over $2,400,000 from the Manhattan Real Estate Company's bank account.  Of this amount, GAJWANI claimed approximately $361,000 in expenses via Expense Reports submitted to the Manhattan Real Estate Company.

*GAJWANI's Actions In May 2012 To Conceal The Amount Of Money He Is Taking From The Manhattan Real Estate Company*

    13.  Based upon my conversations with CW-1, I have learned, in part, the following:

    a. CW-1 began working at Company-1 in 2005 and worked there continuously until he joined the Manhattan Real Estate Company.

    b. In October 2011 and November 2011, CW-1 assisted ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant, on a part-time basis. In approximately mid-November 2011, GAJWANI asked CW-1 to join the Manhattan Real Estate Company on a full-time basis, and CW-1 did so.

9

c. During his tenure, GAJWANI regularly expensed activities to the Manhattan Real Estate Company that were not related to the company's business.

d. Beginning in or about January or February 2012, GAJWANI, CW-1, and certain other employees of the Manhattan Real Estate Company began patronizing strip clubs and, at GAJWANI's behest, expensing those strip club visits to the Manhattan Real Estate Company.

e. On approximately four or five occasions, GAJWANI and CW-1 went to strip clubs together, but with no one else, and expensed those visits to the Manhattan Real Estate Company.  GAJWANI approved the expensing of CW-1's bills from strip clubs to the Manhattan Real Estate Company.  CW-1 remembered one of CW-1's such bills totaled approximately $14,000 to $17,000.  On certain of the occasions that GAJWANI and CW-1 went to strip clubs together, GAJWANI purchased cocaine at the strip club and both GAJWANI and CW-1 used the purchased cocaine.  On these latter occasions, GAJWANI paid the entire bill from the strip club, which included the cost for the cocaine.

f. In or about May 2012, CW-1 received a group text message from GAJWANI's wife to GAJWANI, CW-1, and another individual referencing a large expenditure (the "May 2012 Text Message").  According to CW-1, this expenditure was related to a strip club charge that GAJWANI's wife had discovered.

g. On or about May 9, 2012, after CW-1 received the May 2012 Text Message, GAJWANI sat down with CW-1 and told him that GAJWANI was having marital problems.  After CW-1 offered to help GAJWANI, GAJWANI told CW-1 that GAJWANI needed help paying down his credit card debt.  GAJWANI then wrote a $16,000 check from the bank account of the Manhattan Real Estate Company, made the check payable to CW-1, and wrote "expenses" in the memo line of the check (the "$16,000 Check to CW-1"). GAJWANI asked CW-1 to deposit the check and then provide GAJWANI with a check in return.  CW-1 then obtained a cashier's check for $16,000 from his bank in Manhattan and gave that check to GAJWANI (the "$16,000 Check to GAJWANI").

h. On or about May 22, 2012, GAJWANI gave CW-1 a second check that was in the amount of $14,920, which was made payable to CW-1 from the bank account of the Manhattan Real Estate Company, and which was marked "expenses" in the check's memo line (the "$14,920 Check to CW-1").  CW-1 deposited this check in CW-1's bank account, wrote a check in the amount of $14,920 from CW-1's bank account to "Rockie

Gajwani[,]" wrote "Expenses" in the memo line, and gave the check to GAJWANI (the "$14,920 Check to GAJWANI").

i. When CW-1 received the $16,000 Check to CW-1 and the $14,920 Check to CW-1, both marked "expenses," CW-1 knew that these two checks were not for expenses of the Manhattan Real Estate Company. When CW-1 provided the $16,000 Check to GAJWANI and the $14,920 Check to GAJWANI, CW-1 knew that these two checks were not for expenses of the Manhattan Real Estate Company.

j. On one occasion, GAJWANI directed CW-1 to buy tickets to the musical, "Rock of Ages," so that GAJWANI's family could attend the musical, and expense the tickets to the Manhattan Real Estate Company. CW-1 did so.

### Additional Efforts GAJWANI Took To Conceal How Much Money He Was Taking

14. Based on my conversations with another employee of the Manhattan Real Estate Company ("Employee-4"), I have learned, in part, the following:

a. Employee-4 was hired by the Manhattan Real Estate Company in late June or early July 2012.

b. Employee-4 was given the title of "Director of Accounting" but was the only employee in the Manhattan Real Estate Company's accounting department. Her duties included creating and implementing an accounting system, including preparing the general ledger for the Manhattan Real Estate Company and providing Company-1 with periodic accounting reports of the Manhattan Real Estate Company.

c. In connection with preparing the first accounting report, Employee-4 needed specific information on employee reimbursements and officer compensation from the inception of the Manhattan Real Estate Company in late 2011.

d. With regard to ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant, Employee-4 needed to determine how to allocate GAJWANI's compensation versus his expenses.

e. Employee-4 asked GAJWANI for details on compensation on more than one occasion and GAJWANI repeatedly said he would get details to her, but failed to do so.

15.   Based on my conversations with CW-1 and my review of email communications, I have learned the following, in substance and in part:

a. ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant, did not want Employee-4 to send a general ledger to Company-1.

b. GAJWANI wanted the general ledger to have the payroll for all employees lumped together, rather than listed individually.

c. In or about February 2013, GAJWANI told CW-1 not to answer any phone calls from anyone at Company-1.

d. On or about February 19, 2013, Employee-4 provided the general ledger by email to Company-1 with the payroll for all employees lumped together, as GAJWANI had instructed.  In response, Company-1 requested that Employee-4 provide additional detail.

e. On or about February 21, 2013, at 9:22 a.m., Employee-4 sent an email to GAJWANI attaching "the General Ledger detail" that Company-1 was requesting.  That day, at 11:00 a.m., GAJWANI forwarded Employee-4's email to CW-1 alone, stating, "How can we redo this so it's not so detailed?"  After CW-1 replied with an email that suggested "creat[ing] broad categories" that would lump together employee salaries, GAJWANI sent CW-1 an email stating, "Good idea [l]et's try that".

f. On or about February 26, 2013, at 12:35 p.m., CW-1 sent an email to Employee-4 requesting that she prepare the ledger with "[p]ayroll as one line item and the remainder itemized."  At 12:48 p.m. that same day, Employee-4 replied to CW-1 stating, "[CW-1], as I told you earlier that is not what [employee of Company-1] requested. He asked for a detailed General Ledger."

g. On or about February 25, 2013, GAJWANI and CW-1 had a meeting at the Manhattan location of a tenant of a building owned by the Manhattan Real Estate Company.  After meeting with the tenant, GAJWANI and CW-1 went to a neighboring bar.

h. At the bar, GAJWANI told CW-1, among other things, "I'm fucked."  GAJWANI proceeded to discuss with CW-1 how to come up with a rationale as to why the compensation GAJWANI had taken was so drastically different than what was agreed on in the compensation agreement.  During the meeting at the bar, GAJWANI and CW-1 worked

12

to come up with a rationale as to why the compensation GAJWANI took was so high.  GAJWANI ended up deciding to use the rationale that if he "grossed up" certain of his expenses using a high tax rate, he could "get" his compensation to $1.8 million, which was closer to the amount he took.

i. The next day, on or about February 26, 2013, GAJWANI and CW-1 met in CW-1's office at the Manhattan Real Estate Company in Manhattan.  At that meeting, GAJWANI and CW-1 created documents that backed into the $1.8 million figure that GAJWANI and CW-1 had discussed the previous day.  At that meeting, GAJWANI and CW-1 discussed the figure that was listed on the general ledger for GAJWANI's compensation, $2.3 million.  GAJWANI and CW-1 discussed how to get as close to the $2.3 million figure as possible.  On or about February 26, 2013, GAJWANI emailed a spreadsheet with calculations totaling $1,819,122 to Employee-3, days prior to Employee-3's flight to New York, which is discussed in further detail below.

16.    Based on my conversations with Employee-1 and my review of emails provided by Company-1 and the Manhattan Real Estate Company, I have learned, in part, the following:

a. In or about January 2013, ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant, told employees of the Manhattan Real Estate Company that no one should talk to anyone from Company-1 without GAJWANI's permission.

b. GAJWANI told Employee-2, his administrative assistant, that if anyone from Company-1 called, Employee-2 was to say that everyone was out of the office.

c. GAJWANI told Employee-4 not to send Company-1 the financial information that Company-1 was requesting.

d. GAJWANI told Employee-1 that employees of Company-1 were trying to reach GAJWANI but GAJWANI told them GAJWANI was sick so that GAJWANI would not have to deal with them.

e. On or about February 28, 2013, Employee-1 raised concerns about GAJWANI to an employee of Company-1 ("Employee-5").

f. On or about February 28, 2013, Employee-1 sent an email to Employee-3 and Employee-5 stating, among other things:

13

        i. "[Employee-4] has recently approached me to discuss some issues of grave concern, and I believe that I have a fiduciary duty to bring them to your attention."

        ii. "Rockie discouraged [Employee-4] and [another employee] from having any direct communication with [Employee-5] for the past several weeks, including email and telephone, as he was very nervous about releasing the general ledger."

        iii. "Rockie instructed [Employee-4] to modify the general ledger with respect to his payroll. (As a note, [Employee-4] refused)."

        iv. "Rockie worked to reverse engineer his comp[ensation] earlier this week to justify what he drew down through 2012."

        v. "Rockie has used a debit card to withdraw cash directly from the [Manhattan Real Estate Company] with no ensuing backup."

    g. On or about March 1, 2013, Employee-3 and Employee-5 flew to New York and met with GAJWANI at the Manhattan Real Estate Company's office, which was in Manhattan. Employee-3 and Employee-5 brought a copy of the Employment Agreement to this meeting. At the meeting, Employee-5 identified large wire transfers for GAJWANI. Employee-3 then stated, in substance and in part, that the wire transfers did not match up to the Employment Agreement and that this was wrong, which GAJWANI acknowledged twice by saying, "I know."

    h. On or about March 3, 2013, GAJWANI sent an email to Employee-3 and Employee-5 stating, among other things: (i) "Last but not least- and frankly, most importantly, I made a mistake . . ."; (ii) "I am sincerely and deeply sorry and regret what happened"; (iii) "I . . . pledge that nothing like this would ever happen again."; and (iv) "I also pledge to fix and rectify any way possible the error made solely by me."

## THE TAX EVASION SCHEME

    17. Based on my review of tax records and my conversations with an accountant for ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant ("Accountant-1"), I have learned, in part, the following:

    a. In or about April 2012, Accountant-1 met with GAJWANI

14

in connection with preparing an IRS Form 4868 Application for
Automatic Extension of Time to File U.S. Individual Income Tax Return
(an "Extension Application") for calendar year 2011.  GAJWANI told
Accountant-1 that GAJWANI had received approximately $600,000 in
income for calendar year 2011.  Accountant-1 calculated GAJWANI's
federal tax liability and informed GAJWANI of the amount that GAJWANI
should forward to the IRS as a payment.  On or about April 17, 2012,
Accountant-1 filed an Extension Application for calendar year 2011
for GAJWANI at GAJWANI's direction.  This Extension Application did
not include any response to the application question asking for an
"Estimate of total tax liability for calendar year 2011" or the
application question asking for the "Balance due[]".  Accountant-1
told GAJWANI that the extension was an extension for the filing of
the Form 1040 and not an extension for the tax payment that was due.

       b.    In or about April 2013, Accountant-1 met with GAJWANI
in connection with preparing an Extension Application for calendar
year 2012.  GAJWANI told Accountant-1 that GAJWANI had earned
approximately $950,000 in income for calendar year 2012.
Accountant-1 consequently calculated the approximate amount of
federal tax due for calendar year 2012 and informed GAJWANI of that
figure.  On or about April 17, 2013, Accountant-1 filed an Extension
Application for calendar year 2012 for GAJWANI at GAJWANI's
direction.  This Extension Application did not include any response
to the application question asking for an "Estimate of total tax
liability for calendar year 2012" or the application question asking
for the "Balance due[]".

       c. In or about April 2014, Accountant-1 met with GAJWANI in
connection with preparing an Extension Application for calendar year
2013.  GAJWANI told Accountant-1 that GAJWANI had earned
approximately $260,000 in income for calendar year 2013.
Accountant-1 consequently calculated the amount of federal tax due
for calendar year 2013 and informed GAJWANI of that figure.  On or
about April 17, 2014, Accountant-1 filed an Extension Application
for calendar year 2013 for GAJWANI at GAJWANI's direction.  This
Extension Application did not include any response to the application
question asking for an "Estimate of total tax liability for calendar
year 2013" or the application question asking for the "Balance
due[]".

       18.    Based on my conversations with an agent of the IRS,
I have learned that ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the
defendant, did not file Forms 1040 for calendar years 2011, 2012,
and 2013 between April 2012 and June 2015.

15

19.   Based on my involvement in this investigation, in or about May 2015 I learned, in substance and in part, that counsel for ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant, had learned of a criminal investigation of GAJWANI.

20.   Based on my review of tax records and my conversations with an accountant for ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant, ("Accountant-2"), I have learned, in part, the following:

a. In or about June or July 2015, GAJWANI met with Accountant-2 to discuss preparation of tax returns.

b. Accountant-2 directed GAJWANI to provide Accountant-2 with all of his income and expenses.  Based on information provided by GAJWANI, Accountant-2 prepared tax returns, including Forms 1040, for GAJWANI for calendar years 2011, 2012, and 2013.

c. On or about July 9, 2015, GAJWANI signed under penalty of perjury and filed with the IRS a Form 1040 for calendar year 2011 (the "2011 Tax Return").

d. On or about July 9, 2015, GAJWANI signed under penalty of perjury and filed with the IRS a Form 1040 for calendar year 2012 (the "2012 Tax Return").

e. On or about July 9, 2015, GAJWANI signed under penalty of perjury and filed with the IRS a Form 1040 for calendar year 2013 (the "2013 Tax Return").

f. GAJWANI paid $2,000 to the IRS in connection with the filing of both the 2011 Tax Return and the 2012 Tax Return.  GAJWANI failed, however, to make any payments to the IRS in connection with the filing of the 2013 Tax Return.

21.   Based on my review of certain tax calculations prepared by an IRS revenue agent assigned to the case of ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant, I have learned the following:

a. For tax year 2011, the 2011 Tax Return understated GAJWANI's actual income by more than $480,000, and included over $85,000 in false impermissible tax deductions.

b. For tax year 2012, the 2012 Tax Return included over

16

$260,000 in false impermissible tax deductions.

  c. For tax year 2013, the 2013 Tax Return underreported GAJWANI's actual income by $270,000.

  WHEREFORE, deponent prays that an arrest warrant be issued for the arrest of ROCKWELL GAJWANI, a/k/a "Rockie Gajwani," the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

            _____
            ROBERT CLARK
            Inspector
            United States Postal
            Inspection Service

Sworn to before me this
_0_th day of July 2016

_____
THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

17